**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
SANKET VYAS,

                                    Plaintiff,

            -against-

TAGLICH BROTHERS, INC. and TAGLICH
PRIVATE EQUITY, LLC

                                    Defendants.
------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:_____**
**DATE FILED:** 12/20/2023

**23-CV-8104 (AT) (KHP)**

**OPINION AND ORDER ON**
**MOTION TO AMEND**

**KATHARINE H. PARKER, United States Magistrate Judge:**

          This action was commenced by Plaintiff, Sanket Vyas, as liquidating agent for and

on behalf of Q3 I, L.P. ("Q3I"), against Defendants Taglich Brothers, Inc. and Taglich Private

Equity, LLC (collectively, "Taglich").  Before the Court is Plaintiff's Motion for Leave to file a

Second Amended Complaint.  (ECF No. 158.)  For the reasons stated below, the motion is

DENIED.[1]

---

[1]  The Court of Appeals for the Second Circuit has not clearly stated whether a denial of leave to amend a pleading
should be treated as dispositive or nondispositive for Rule 72 purposes, but it has suggested that motions to
amend are nondispositive.  *See Fielding v. Tollaksen*, 510 F.3d 175, 178 (2d Cir. 2007) ("As a matter of case
management, a district judge may refer nondispositive motions, such as a motion to amend the complaint, to a
magistrate judge for decision without the parties' consent."); *Gullo v. City of New York*, 540 F. App'x 45, 47 (2d
Cir. 2013) (affirming a district court's decision that applied clear error review in upholding a magistrate judge's
denial of a motion for leave to amend).  The weight of opinion in this District favors treating the issue as
nondispositive.  *See Tardif v. City of New York*, 2016 WL 2343861, at *2 (S.D.N.Y. May 3, 2016) (collecting cases);
*see also LoCurto v. AT&T Mobility Servs. LLC*, 2017 WL 11826511, at *2 (S.D.N.Y. July 17, 2017) (Torres, J.)
(applying the clear error or contrary to law standards of Rule 72(a) to a magistrate judge's decision denying the
motion for leave to amend the complaint).  Accordingly, the instant decision is issued as an Opinion and Order
rather than a Report and Recommendation.

**BACKGROUND**

1. <u>**Facts Alleged in the First Amended Complaint ("FAC")**</u>

According to the FAC, which is the operative complaint, Q3I is a limited partnership that was formed in 2018 to facilitate and formalize a cryptocurrency trading club. (ECF No. 48 ("FAC") ¶ 1.)  Q3I is managed by its general partner, Q3 Holdings, which was managed by a board composed of Quan Tran, James Seijas, and Michael Ackerman ("Ackerman").  (*Id.* ¶ 9.)

In or about September 2018, Q3I retained Denis McEvoy ("McEvoy"), a Chartered Financial Analyst, as its fund administrator.  (*Id.* ¶ 5.)  Q3I paid McEvoy a "hefty fee" based on the understanding that McEvoy would oversee the administration of the partnership, manage Q3I's compliance policies and procedures, and protect Q3I from fraud.  (*Id.* ¶¶ 5, 26.)  At the time, McEvoy was employed by Taglich.  (*Id.* ¶ 5.)  Relying on McEvoy's "advertised association with Taglich on Taglich's web site and elsewhere, as well as McEvoy's use of Taglich resources," Q3I believed that McEvoy was acting on Taglich's behalf and that he was "fully backed" by Taglich when he was hired.  (*Id.* ¶ 22.)  The FAC alleges on information and belief that Taglich was "aware that McEvoy was serving as Q3I's fund administrator," and that Taglich "was informed of and approved McEvoy's work for Q3I," consistent with Financial Industry Regulatory Authority rules that require broker-dealers such as McEvoy to disclose outside business activities to their employer.  (*Id.* ¶¶ 32, 34.)

In approximately December 2019, it came to light that Ackerman was operating a scheme to defraud Q3I of millions of dollars.  (*Id.* ¶¶ 2, 57.)  Ackerman accomplished this fraud by reporting false returns in the crypto exchange accounts to Q3I and using the false returns to take unearned "profits" from Q3I pursuant to a profit participation agreement.  Ackerman was

not taking any profit, but rather was stealing the limited partners' deposits.  (*Id.* ¶ 3.)  McEvoy

did not notice the fraudulent activity or do anything to report it or prevent it.  (*Id.* ¶¶ 5, 6.)

The FAC alleges that McEvoy was negligent and breached his duty of care to Q3I.

Notwithstanding Plaintiff's acknowledgement that Taglich was aware of McEvoy's activities by

virtue of his outside activities report and that Q3I was not a customer of Taglich, the FAC

further alleges that "McEvoy's service as the fund administrator for Q3I was within the scope of

his employment with Taglich" and that Taglich, as McEvoy's employer, is liable for McEvoy's

negligence.  (*Id.* ¶ 24.)  The FAC does not state what McEvoy's duties were for Taglich to

support this assertion.  The FAC asserts claims against Taglich for breach of fiduciary duty, gross

negligence, and common law negligence.  (*Id.* ¶¶ 49-63.)

### 2. Procedural History

After Ackerman's fraud came to light, Q3I was liquidated and Plaintiff was appointed as

liquidating agent of Q3I to wind up Q3I's affairs and marshal and liquidate its assets, including

the liquidation of the claims in the instant case.  (*Id.* ¶ 7.)

On July 5, 2022, Plaintiff filed the initial complaint in the U.S. District Court for the

Middle District of Florida.  (ECF No. 1.)  On December 2, 2022, the Honorable Charlene Edwards

Honeywell issued a scheduling order setting the deadline to add parties or amend the pleadings

as January 13, 2023 and setting discovery deadlines.  (ECF No. 40.)  Plaintiff filed the FAC on

December 5, 2022, amending the jurisdictional allegations.  On December 19, 2022, Taglich

moved to dismiss the FAC.  (ECF No. 52.)  On April 4, 2023, Taglich moved to stay discovery.

(ECF No. 67.)  On September 12, 2023, Judge Honeywell transferred the case to this District.

On September 27, 2023, the Honorable Analisa Torres issued an order denying Taglich's motion to stay discovery and terminating the motion to dismiss the FAC without prejudice. Judge Torres directed Taglich, by October 17, 2023, to either file an answer, file a new motion to dismiss in accordance with Judge Torres' Individual Practices, or file a letter with the Court stating that it relies on the previously filed motion to dismiss. (ECF No. 129.) Judge Torres then referred this matter to me for General Pretrial supervision and to resolve Plaintiff's outstanding motion to compel discovery. (ECF No. 130.) On October 10, 2023, Plaintiff filed a letter seeking a pre-motion conference to discuss its anticipated motion to amend. I held a conference with the parties on October 11, 2023, at which I resolved the motion to compel and set a briefing schedule for the motion for leave to amend. In light of the anticipated motion for leave to amend, I adjourned *sine die* the October 17 deadline for Taglich to answer the complaint or move to dismiss pending a decision on the motion for leave to amend the complaint.

On October 27, 2023, Plaintiff filed the instant motion to amend seeking in pertinent part to add claims for gross negligent supervision, gross negligent retention, negligent supervision, and negligent retention. Plaintiff asserts in his memorandum of law in support of the motion that Taglich recently provided documents in discovery that reveal that it "had actual knowledge of McEvoy's work for Q3I but did nothing to restrict or prohibit his involvement with the fund." (ECF No. 158 at 1.) In addition, the New York Court of Appeals recently issued a decision – *Moore Charitable Foundation v. PJT Partners, Inc.*, 40 N.Y.3d 150 (2023) – which Plaintiff asserts "expand[s] the scope of causes of action for negligent supervision and negligent retention as they apply to businesses in the financial industry." (*Id.*)

**LEGAL STANDARD**

Under Rule 15(a) of the Federal Rules of Civil Procedure, "a party may amend its

pleading once as a matter of course within . . . 21 days after serving it, or . . . if the pleading is

one to which a responsive pleading is required, 21 days after service of a responsive pleading or

21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier."  Fed. R. Civ.

P. 15(a)(1).  "In all other cases, a party may amend its pleading only with the opposing party's

written consent or the court's leave.  The court should freely give leave when justice so

requires.  Fed. R. Civ. P. 15(a)(2).  Courts grant leave to amend "absent evidence of undue

delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing

party, or futility."  *Monahan v. N.Y.C. Dep't of Corrs*., 214 F.3d 275, 283 (2d Cir. 2000).  The

Second Circuit has stated that "[t]his permissive standard is consistent with our strong

preference for resolving disputes on the merits."  *Williams v. Citigroup Inc.*, 659 F.3d 208, 212-

13 (2d Cir. 2011) (citation omitted).

When amendment is sought after a deadline set in a scheduling order, the lenient

standard under Rule 15(a) must be balanced against Rule 16(b)'s prescription that scheduling

orders may be modified only upon a showing of good cause.  *Holmes v. Grubman*, 568 F.3d 329,

334 (2d Cir. 2009); *see also* Fed. R. Civ. P. 16(b)(4) (a scheduling order "may be modified only

for good cause and with the judge's consent.").  The determination of whether "good cause"

exists under Rule 16(b) largely turns on the diligence of the moving party.  *Holmes*, 568 F.3d at

335; *see also Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457

(S.D.N.Y. 2012) (citation omitted) (explaining that to show good cause, the moving party must

demonstrate that "despite its having exercised diligence, the applicable deadline could not

have been reasonably met").  "To demonstrate good cause based on newly discovered

information, a party must be able to show, *inter alia*, that the previously unknown information

is the 'primary basis' of its proposed amendment."  *Sec. & Exch. Comm'n v. Rio Tinto plc*, 2020

WL 2504008, at *11 (S.D.N.Y. Mar. 9, 2020) (citations omitted), *objections overruled*, 2021 WL

807020 (S.D.N.Y. Mar. 3, 2021).  Importantly, good cause is not present if "the proposed

amendment rests on information that the party knew or should have known" before the

deadline to amend.  *Id*.

In general, "[b]ecause compliance with Rule 16 is a threshold matter which may obviate

the Rule 15 analysis," the Court should address it first.  *Id*.

**APPLICATION**

1. **Whether There is Good Cause for Amendment**

The deadline for amending the complaint was January 13, 2023.  Plaintiff contends that

its new causes of action are appropriate because it only just obtained a production of

documents from Taglich showing that McEvoy disclosed his work for Q3I as an "outside

activity" and, thus, Plaintiff only recently obtained proof that Taglich knew McEvoy did work for

Q3I.  Plaintiff also appears to rely on a September 2022 deposition of McEvoy in which McEvoy

testified that he was not a "fund administrator" for Q3I to eliminate all references to McEvoy

being a "fund administrator" for Q3I.  Finally, Plaintiff relies on the recent New York Court of

Appeals decision in *Moore Charitable Foundation*, which made clear that a company can be

held liable to a non-client/customer for the negligent acts of its employee.

To start, McEvoy's deposition testimony from September 2022 does not constitute good

cause for moving to amend a year later.  Plaintiff had the relevant testimony well before the

deadline to amend and offers no excuse for not moving to amend earlier or including the

changes it now seeks to make in the amended complaint it filed in December 2022. *See Gullo*,

540 F. App'x at 47 (affirming denial of leave to amend for lack of diligence where plaintiffs

moved to amend three months after learning the relevant information); *Tardif*, 2016 WL

2343861, at *5 (finding "lengthy delay" of five months fell "far short of the diligence necessary

to show good cause").

Second, Taglich's production of a document merely confirming what is already alleged in

the operative complaint – that Taglich knew of and approved of McEvoy's work for Q3I – does

not constitute new evidence relevant to the proposed amendments. Since the beginning of this

case Plaintiff has asserted that Taglich was aware of McEvoy's work for Q3I. In other words,

this fact cannot be the basis for adding a negligent supervision/retention claim. *See, e.g.,*

*Farsura v. QC Terme US Corp.*, 2023 WL 2919553, at *8 (S.D.N.Y. Mar. 14, 2023) (recommending

denying leave to amend for lack of good cause where "all facts" relevant to the amendment

"were in Plaintiffs' possession or could have been gleaned from public sources"), *report and*

*recommendation adopted*, 2023 WL 4348388 (S.D.N.Y. July 5, 2023); *Bryan v. Commack Union*

*Free Sch. Dist.*, 2021 WL 633751, at *7 (E.D.N.Y. Feb. 18, 2021) (denying leave to amend for lack

of good cause where "many of the allegations . . . were already contained in the original

Complaint, indicating the Plaintiff was aware of them").

The only new development that post-dates the deadline for amending the complaint is

the *Moore Charitable Foundation* decision. Plaintiff says that until this decision was issued,

there was no basis to hold Taglich responsible for negligent supervision/retention. While it is

true that the New York Court of Appeals ended any dispute that a customer relationship is not a

prerequisite to a negligent supervision/retention claim, the Court of Appeals cited several cases

holding companies liable for torts committed by their employees against non-customers.  40

N.Y.3d 150 (collecting cases).  *See Selmani v. City of New York*, 116 A.D.3d 943 (2d Dept 2014)

(where plaintiffs were attacked by off-duty New York City Fire Department employees, denying

the City's motion for summary judgment as to claims of negligent hiring, supervision, training,

and retention, because the City did not submit evidence demonstrating that it did not know or

have reason to know of the employee's alleged propensity for assaultive conduct); *Quiroz*

*v. Zottola*, 96 A.D.3d 1035 (2d Dept. 2012) (reversing lower court decision dismissing plaintiff's

negligent hiring and supervision claims against employer of truck driver who was involved in a

car accident that injured plaintiff, where the evidence suggested the employer had received

complaints about the driver's driving); *see also Hogle v Franklin Mfg. Co.*, 199 NY 388, 392

(1910) (finding that employer could be liable for negligently failing to prevent its employees

from mischievously throwing rocks out of the company window and injuring the plaintiff).

Thus, it is not the case that there was no legal support for including such a cause of

action in the complaint at the outset of this action.  Plaintiff's lawyers are zealous, competent

and creative advocates who surely were aware of this case law.  Indeed, they have not argued

that they were deterred from asserting these claims because the lack of a customer

relationship was a legally settled requirement that deterred them from including the claims in

the first place.  Further, as discussed below, *Moore Charitable Foundation* does not support a

finding that the proposed new claims are plausible based on the facts alleged – none of which

are new.

2.  **Whether The New Causes of Action for Negligent Supervision and Retention are Futile**

The Court in *Moore Charitable Foundation* considered whether the trial court improperly dismissed a negligent supervision/retention claim at the pleading stage.  The defendants in that case were an investment bank and its asset advisory and fundraising division.  The defendants' employee was responsible for representing private equity fund managers who wanted to provide additional capital for their investors.  The employee had authority to solicit clients, use the company brand name and resources to market its services, negotiate deals with clients, and even invoice clients.  40 N.Y.3d at 153.  Defendants also gave their employee access to virtual data rooms containing confidential information about pending investment banking deals and other projects.  *Id.*  The employee was initially successful in his job but then began to engage in excessive high-risk securities trading from his personal accounts during work hours, obsessively monitor his stock positions every few minutes, drink alcohol in excess during the business day, and hold business meetings while inebriated, among other dangerous and destructive behaviors.  *Id.* at 153-54.

Notwithstanding the employee's concerning behavior, he landed a major deal involving the recapitalization of a private equity fund managed by Irving Place Capital.  *Id.* at 154.  For their part in the deal, defendants found a new investor – Coller Capital – to buy out Irving Place Capital's existing equity holders.  Upon the close of the deal, Irving Place Capital owed the defendants a deal fee of $8.1 million.  *Id.*  The employee, however, diverted the fee to himself by sending a fake invoice to Irving Place Capital and directing it to transfer the fee to a personal account labeled to look as if it was controlled by the defendants.  The employee used the money to purchase securities through his personal account and those securities then lost all

their value.  *Id.*  A month after the closing, the defendants' back office asked the employee why Irving Place Capital had not yet paid the $8.1 million fee.  The employee falsely responded that the fee would be paid upon a "stub closing."  *Id.*  The employee's response should have been a red flag that something was amiss because the deal terms did not call for a "stub closing."  The employee's response was also suspicious because, when a deal included a "stub closing" term, only a portion of the fee would be withheld until the "stub closing."  Nonetheless, defendants accepted the employee's explanation without investigation or follow up.  *Id.* at 155.

The employee then engaged in a scheme to obtain funds to replace the $8.1 million he had stolen and lost through risky investments.  *Id.*  He contacted Moore Charitable Foundation using his work email and offered it an opportunity to invest in the Irving Place Capital transaction for a guaranteed return rate, representing that the Irving Place Capital deal had not yet closed.  He then accessed defendants' confidential database and sent Moore Charitable Foundation a real annual financial report for Irving Place Capital.  *Id.*  Moore Charitable Foundation ended up contributing $25 million.  The employee then emailed instructions to wire the money to a special purpose vehicle he created and named to appear like it was affiliated with defendants, along with a promissory note, security agreement, and letter bearing the signature of a fictitious representative for Irving Place Capital.  *Id.*  The employee then transferred $8.1 million from the special purpose vehicle to defendants so that it appeared as if Irving Place Capital was paying the deal fee.  He transferred the remainder of the $25 million to his personal account and used it to engage in speculative investing that resulted in losses of more than $14 million.  *Id.* at 156.  The Moore Charitable Foundation discovered the fraud

months later when it called Irving Place Capital and asked to speak with the fictitious person whose signature was on the letter.  The employee was later convicted of securities fraud.

The Moore Charitable Foundation sued the defendants for, among other things, negligent retention and supervision.  The trial court dismissed the complaint finding it failed to adequately plead that defendants were on notice of their employee's propensity for fraud and suggested that defendants' duty ran only to its customers.  The Appellate Division affirmed dismissal of the claims, finding that the complaint did not adequately allege that defendants were aware of facts that would have put them on notice of the employee's criminal propensities and because the plaintiff was not the defendants' customer.

The Court of Appeals reversed, finding that a customer relationship is not a prerequisite to a negligent supervision claim.  *Id.* at 157.  It also held that the complaint adequately alleged that the defendants were or should have been on notice of the employee's propensity to engage in tortious conduct.  It explained that "[a]n employer 'should know' of an employee's dangerous propensity if it has *reason* to know of the facts or events evidencing that propensity, and may be liable if it nonetheless 'place[s] the employee in a position to cause foreseeable harm.'"  *Id.* at 158 (citation omitted).  It further explained that "the notice element is satisfied if a reasonably prudent employer, exercising ordinary care under the circumstances, would have been aware of the employee's propensity to engage in injury-causing conduct."  *Id.* at 158-59.  It then noted that the allegations in the complaint that the defendants knew the employee engaged in excessive drinking and obsessive personal stock trading during work hours and that the employee gave a patently false explanation for why Irving Place Capital had not yet paid the $8.1 million fee were sufficient to permit an inference that the defendants were on notice (or

should have been).  The Court was careful to say that the employee's drinking and gambling alone were insufficient to put the employer on notice for a propensity to commit an injury-causing act, but coupled with the additional fact of the transparent dishonesty, these allegations were sufficient at the pleading stage to state a plausible – or at least not an "entirely speculative" – claim for negligent supervision/retention.  *Id*. at 160.

When explaining its rationale for rejecting the proposition that non-customers were precluded from asserting negligent supervision claims, it explained that various limiting/balancing factors would avoid opening the floodgates to an indeterminate class of plaintiffs.  *Id.* at 162.  These factors include not just the constructive notice element of the claim, but also the reasonably prudent employer standard and proximate cause standard.  *Id*.  It explained that "if the employee's tortious conduct is too attenuated from the employment relationship, the employer will not be liable."  *Id.*

*Moore Charitable Foundation* does not support Plaintiff's addition of a negligent supervision/retention claim here.  The allegations in the proposed amended complaint are different than those in *Moore Charitable Foundation* that were found sufficient to make the claim plausible.  Specifically, the allegations connecting Taglich to the harm are far more attenuated.  To start, although Q3I was a victim of fraud, the fraud was committed by Ackerman – a managing partner of Q3I, and *not* a Taglich employee.  Plaintiff contends that Taglich's employee, McEvoy, was negligent in failing to detect Ackerman's fraud, but they concede in the proposed amended complaint, for purposes of the negligent supervision/retention claim, that McEvoy was not acting on behalf of Taglich when he worked for Q3I but, rather, was engaged in "outside business activities."  But, Plaintiff nevertheless

contends that Taglich is responsible for the losses caused by Ackerman's fraud because it was negligent in not ensuring that McEvoy was not negligent when performing his outside work for Q3I, which if performed non-negligently would have averted the fraud.

In *Moore Charitable Foundation*, the defendants' employee pretended to act on behalf of the defendants and used defendants' resources, including email and confidential deal information, to perpetrate the fraud.  Here, the only Taglich resource that McEvoy allegedly used was his Taglich email address.  Further, assuming without deciding that the complaint sufficiently pleads that McEvoy was negligent in not detecting the fraud, the only facts pleaded to support the contention that Taglich knew or should have known of McEvoy's propensity to engage in the negligence is that it knew McEvoy was performing work for Q3I because he disclosed it as an "outside activity" (i.e., work unrelated to his work for Taglich); that McEvoy on occasion used his Taglich email to communicate with Q3I; and that McEvoy "had no experience" in cryptocurrency.

These facts fall short of raising a plausible claim of negligent supervision/retention.  That McEvoy had no experience in cryptocurrency does not indicate a propensity to engage in negligent conduct.  When given the chance at oral argument, Plaintiffs could not point to any specific emails or other conduct or evidence that would have put Taglich on notice that McEvoy had a propensity to engage in negligent conduct of the kind that allegedly led to Q3I's harm. The facts are far different than in *Moore Charitable Foundation*, where the employee engaged in risky behavior at work that suggested he might have money problems and then gave an obvious lie about missing funds that he was responsible for collecting.  Thus, the proposed

additional claims are futile because there are no facts pleaded that render it plausible that Taglich knew or should have known of McEvoy's propensity for negligence.

## CONCLUSION

For the reasons set forth above, the motion to amend is denied. **The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 158.**

By **Friday, January 5, 2024**, Defendants shall either: (1) file an answer to the FAC; (2) file a new motion to dismiss in accordance with Judge Torres' Individual Practices in Civil Cases; or (3) re-file the previously filed motion to dismiss.

SO ORDERED

Dated: December 20, 2023
        New York, NY

_Katharine H. Parker_

KATHARINE H. PARKER
United States Magistrate Judge